IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:20-CV-218-FL

TALLEYWHACKER, INC., d/b/a Arizona )
Pete's Country Music Saloon; ASHEVILLE )
GOLF & TRAVEL, INC., d/b/a The )
Treasure Club; BLL ENTERPRISES, INC., )
d/b/a Leather & Lace South; B&S )
ENTERPRISES, INC., d/b/a Tassels; )
DBD#1, INC., d/b/a Leather and Lace )
Gastonia; DDDD, INC., d/b/a Gold Club; )
EDISON'S LOUNGE, LLC, d/b/a Edison's )
Lounge Gentlemen's Club; GIST AND )
HENDRIX, LLC, d/b/a Secrets Cabaret; )
JACKSONVILLE GOLF AND TRAVEL, )
LLC; d/b/a Platinum Gentlemen's Club; )
JMB GOLD & TRAVEL, INC., d/b/a The )
Treasure Club Greensboro; LEATHER & )
LACE, INC., d/b/a Leather & Lace )
University; LONG VIEW GOLF & )
TRAVEL, INC., d/b/a The Treasure Club; )
MISTYLOU INVESTMENTS, LLC, d/b/a )
Tobies Gentlemen's Lounge; NATIONAL )          ORDER
GOLF DISTRIBUTORS, LLC, d/b/a )
Stiletto Gentlemen's Club; RDU GOLF & )
TRAVEL, LLC, d/b/a Pure Gold; RPS )
HOLINGS, LLC, d/b/a Capital Cabaret/ 747 )
Chophouse; SOUTHERN PINES GOLF )
DISTRIBUTORS, LLC, d/b/a Cheetah; TD )
Operations, LLC, d/b/a Limelight; TMC )
RESTAURANT OF CHARLOTTE, LLC, )
d/b/a The Men's Club of Charlotte; TOP )
SHELF ENTERTAINMENT, LLC, d/b/a )
Club Onyx; TRIAD GOLF & TRAVEL, )
INC., d/b/a Centerfolds; TWDDD, INC, )
d/b/a Scores; WILMINGTON GOLF )
DISTRIBUTORS, LLD, d/b/a Cheetah; 3 )
MB HOSPITALITY, LLC, d/b/a )
Savannah's Gentlemen's Club; 200 W )
WOODLAWN ROAD, INC., d/b/a )
Gentlemen's Club; 511 COTANCHE ST. )
ENTERTAINMENT, LLC, d/b/a Still Life, )

|                                              |     |
| -------------------------------------------- | --- |
| Plaintiffs,                                  | )   |
|                                              | )   |
|                                              | )   |
| v.                                           | )   |
|                                              | )   |
| ROY A. COOPER, III, in his official          | )   |
| capacity as Governor of the State of North   | )   |
| Carolina,                                    | )   |
|                                              | )   |
| Defendant.                                   | )   |

This matter is before the court on plaintiffs' motion for preliminary injunction.[1]  (DE 13). In accordance with an expedited briefing schedule, defendant responded in opposition and plaintiffs replied.  In this posture, the issues raised are ripe for ruling.  For the following reasons, plaintiffs' motion is denied.

## STATEMENT OF THE CASE

Plaintiffs commenced this action on May 26, 2020, to enjoin defendant from applying and enforcing executive orders mandating a closure of their entertainment businesses following declaration of a State of Emergency to address the Coronavirus Disease 2019 ("COVID-19").  Plaintiffs also seek declaratory relief, attorneys' fees, and costs.

Plaintiffs assert claims under 42 U.S.C. § 1983 for violation of 1) the Equal Protection Clause of the Fourteenth Amendment, 2) the Free Speech Clause of the First Amendment, and 3) Due Process Clause of the Fifth and Fourteenth Amendments.  Plaintiffs also assert claims under the North Carolina constitution.  In support of the complaint, plaintiffs rely upon declarations by their owners and authorized representatives, affirming the veracity of the factual allegations in the

---

[1]      Plaintiffs originally sought both preliminary injunction and temporary restraining order ("TRO").  The court denied that part of the motion seeking TRO by separate order entered May 27, 2020.

2

complaint. (See DE 2 – DE 12). Executive orders purportedly at issue in the action, along with guidance documents and plans issued by defendant, also have been made a part of the record.

Plaintiffs filed the instant motion on May 26, 2020, with accompanying memorandum of law and notice of summons to defendant, seeking emergency relief in the form of a TRO and preliminary injunction -

> enjoining the Defendant Governor from applying and enforcing the provisions of Executive Order Nos. 117, 118, 120, 121, 135, 138, and 141, which imposed the forced closure of Plaintiffs' businesses, and those provisions of Executive Order No. 141 that prevent Plaintiffs from being allowed to open and operate the same as restaurants, commercial wineries, breweries, and distilleries, or the many other "service" and other businesses allowed to open and operate under the Phase 2 provisions of Executive Order No. 141.

(Pl's Mot. (DE 13) at 3).

On May 27, 2020, the court denied that part of the instant motion seeking a TRO, directed defendant to file response to the motion by June 1, 2020, and allowed plaintiffs to file a reply by June 3, 2020. Defendant timely responded in opposition to the instant motion with reliance upon 1) affidavit of Dr. Mandy Cohen ("Dr. Cohen"), Secretary of the North Carolina Department of Health and Human Services ("NCDHHS"); 2) declaration of Tamika Henderson ("Henderson"), Special Deputy Attorney General of the North Carolina Department of Justice; and 3) guidance document issued by NCDHHS on June 1, 2020.

Plaintiffs in reply filed June 3, 2020, place reliance upon 1) affidavit of Doug Adkins ("Adkins"), owner and operator of plaintiffs National Golf Distributors, LLC, RDU Travel & Golf, LLC, Triad Golf & Travel, Inc., and Wilmington Golf Distributors, LLC, with exhibits thereto; 2) affidavit of Joey Bien ("Bien"), owner and operator of plaintiffs Asheville Golf & Travel, Inc., JMB Golf & Travel, Inc., and Long View Golf & Travel, Inc., with exhibits thereto; 3) affidavit of David Baucom ("Baucom"), owner and operator of plaintiffs BLL Enterprises, Inc., B & S Enterprises, Inc., DBD#1, Inc., DBLL, Inc., DDDD, Inc., Leather and Lace, Inc., TWDDD, Inc.,

3

and 200 W. Woodlawn Road, Inc., and exhibits thereto; 4) affidavit of Douglas L. Jenkins, ("Jenkins"), a licensed engineer and designer of ventilation systems, with exhibit thereto; and 5) affidavit of Dr. Arin Piramzadian ("Dr. Piramzadian"), chief medical officer of Star Med Urgent Family Practice Care, with exhibit thereto.[2]

## STATEMENT OF FACTS

A.    Defendant's Executive Orders and Guidance

Plaintiffs allege the contents of executive orders and documents issued by defendant, which documents speak for themselves.  By way of summary, some of the key terms of the executive orders and documents pertinent to plaintiffs' claims are as follows:

1.    Executive Order 116

On March 10, 2020, defendant declared a State of Emergency "based on the public health emergency posed by COVID-19."  (Exec. Order No. 116; see, e.g., Compl., Ex. H. (DE 1-9) at 2 (referencing declaration of State of Emergency)).

2.    Executive Order 117

On March 14, 2020, defendant ordered a prohibition on "mass gatherings," defined as "any event or convening that brings together more than one hundred (100) persons in a single room or single space at the same time," excluding "normal operations at airports, bus and train stations, medical facilities, libraries, shopping malls and centers, or other spaces where more than one hundred (100) persons are gathered." (Compl., Ex. A (DE 1-2) at 3). The prohibition on mass gatherings did "not include office environments, restaurants, factories, grocery stores or other retail

---

[2]    Where neither party requests a hearing, and where the pertinent facts of record are adequately presented in the materials before this court, the court dispenses with a hearing because such hearing would not aid in the decisional process.

establishments." (Id.). Executive Order 117 provides that violations of the prohibition are punishable as a Class 2 misdemeanor.

Executive Order 117 also closed schools through March 30, 2020, and urged "social distancing (approximately six feet away from other people) whenever possible." (Id. at 4).

3. Executive Order 118

On March 17, 2020, defendant ordered a limitation on the "sale of food and beverages, to carry-out, drive-through, and delivery only." (Compl., Ex. B (DE 1-2) at 4). Where Executive Order 117, had specifically excluded "restaurants" and "other retail establishments" from its definition of mass gatherings, Executive Order 118 revised the language to remove "restaurants" and "other retail establishments." (Id.). It also stated "[b]ars are directed to close." (Id.).

4. Executive Order 120

On March 23, 2020, defendant ordered amendment to the definition of mass gatherings to a 50 person threshold. (Compl., Ex. C (DE 1-4) at 4). In addition, Executive Order 120 provided that "entertainment facilities without a retail or dining component are ordered to close at 5:00 pm on Wednesday March 25, 2020, though any retail or dining component may operate within that establishment solely for that purpose," within the requirements of Executive Order No. 118. (Id.). Such "entertainment facilities" were enumerated to include:

- Bingo Parlors. . . .

- Bowling Alleys

- Indoor Exercise Facilities (e.g., gyms . . . indoor trampoline . . . facilities)

- Health Clubs

- Indoor/ Outdoor Pools

- Live Performance Venues

- Movie Theaters

- Skating Rinks

- Spas

- Gaming and business establishments which allow gaming activities

(Id. at 4).

In addition, Executive Order 120 provided that "because the ability to practice the social distancing necessary to reasonably protect against COVID-19 is significantly reduced in certain establishments where individuals are in close proximity for extended periods of time, or service personnel are in direct contact with clients, personal care and grooming businesses, including but not limited to the following are ordered to close:"

- Barber Shops

- Beauty Salons

- Hair Salons

- Nail Salons. . .

- Massage Parlors

- Tattoo Parlors

(Id.).

     5.     Executive Order 121

On March 27, 2020, defendant entered a 30 day "stay at home" order, effective March 30, 2020, with numerous exceptions, including nine broadly-defined "Essential Activities" and 30 broad categories of "Essential Businesses and Operations," including "Restaurants for consumption off-premises." (Compl., Ex. D (DE 1-5) at 4-8). Businesses that were not "Essential Businesses and Operations" were "required to cease all activities within the State except Minimum

Basic Operations," defined as including the "minimum necessary activities to maintain the value of the business's inventory, preserve the condition of the business's physical plant and equipment, ensure security, process payroll and employee benefits, or related functions." (Id. at 10).

In addition, Executive Order 121 reduced the definition of "mass gathering" to more than 10 persons in a single room or single space. (Id.). It provided: "A mass gathering does not include normal operations at airports, bus and train stations, medical facilities, libraries, shopping malls and centers. It also does not include any . . . Essential Business or Operation." (Id.). In addition, it stated: "in an effort to promote human dignity and limit suffering, funerals are permitted to include no more than fifty (50) persons." (Id.).

6.      Executive Order 135

On April 23, 2020, defendant extended the stay at home order and limitations on mass gatherings to May 8, 2020, limited mass gatherings, required social distancing, and restricted visitation at long term care facilities. (Compl., Ex. E (DE 1-6) at 2).

7.      Three-Phase Opening Plan

That same date, defendant produced a slide presentation describing a three-phase plan to lift COVID-19-related restrictions. Contained within the slide describing "Phase 2", it stated that Phase 2 would "[a]llow limited opening of restaurants, bars and other businesses that can follow strict safety protocols (reduced capacity)." (Compl., Ex. F (DE 1-7) at 17; see Compl. ¶ 54).

8.      Executive Order 138 – Phase 1 Opening

On May 5, 2020, defendant ordered commencement of Phase 1, easing restrictions on travel, business operations, and mass gatherings. Executive Order 138 allowed retail businesses to open, if not exempted, with certain requirements, including:

1.      Limit customer occupancy to not more than 50% of stated fire capacity. . . or [12] customers for every [1000] square feet. . . .

7

2.      Limit customer occupancy so that customers can stay six . . . feet apart, even if this requires reducing occupancy beneath the 50% limit stated above. . . .

. . . .

4.      Mark six . . . feet of spacing in lines at point of sale . . . .

(Compl. Ex. G (corrected) (DE 16) at 6). Executive Order 138 continued to restrict restaurants to only "off-premises" consumption. (Id. at 8). It allowed "Child care facilities" and "Day camps and programs for children and teens" to be open with guidelines. (Id. at 9). It ordered schools to remain closed for the remainder of the instructional year. (Id.). It ordered the following business to remain "closed": "Personal Care and Grooming Businesses" and "Entertainment Facilities Without a Retail or Dining Component" (as enumerated already in Executive Order 120). (Id. at 10). Executive Order 138 also provided a prohibition on "Mass Gatherings," with exceptions and qualifications. (Id. at 11).[3] Executive Order 138 specified it was effective through 5:00 pm on May 22, 2020. (Id. at 14).

9.      Executive Order 141

On May 20, 2020, defendant ordered commencement of Phase 2, effective May 22, 2020, further easing restrictions on travel, business operations, and mass gatherings. Executive Order 141 provides different restrictions for different types of businesses:

---

[3]     On May 16, 2020, The Honorable United States District Judge James C. Dever, III, enjoined defendant or his agents "from taking any enforcement action against plaintiffs or any other worshipers pursuant to the assembly for religious worship provisions in [Executive Order] 138. As set forth in section 6(D) of [Executive Order] 138, any person or group of people gathering to worship 'should observe the Recommendations to Promote Social Distancing and Reduce Transmissions to the extent practicable.'" Berean Baptist Church v. Cooper, No. 4:20-CV-81-D, ___ F.Supp.3d ___, 2020 WL 2514313, at *11 (E.D.N.C. 2020).

- Section 6 establishes restrictions for certain listed kinds of businesses and operations. The restrictions in this Section ensure that there is not overcrowding and spread people out in each space to reduce the risk from COVID-19.

- Section 7 establishes a Mass Gathering limit. This limit controls the risk of COVID-19 spread in events or convenings that are not covered by the specific restrictions in Section 6.

- Section 8 keeps closed certain kinds of businesses and operations because those types of businesses, by their very nature, present greater risks of the spread of COVID-19. These greater risks are due to factors such as people traditionally interacting in that space in a way that would spread COVID-19, shared equipment that is repeatedly touched by customers or attendees, or a business model that involves customers or attendees remaining in a confined indoor space over a sustained period.

(Compl. Ex. H (DE 1-9) at 8).

Section 6 restrictions, including for "Retail Businesses" "Restaurants" and "Personal Care, Grooming, and Tattoo Businesses," are based primarily upon limiting "the number of customers in the store to fifty percent (50%) of stated fire capacity . . . [or] no more than twelve (12) customers for every one thousand square feet" of space. (Id. at 8, 9, 10). Indoor and outdoor pool facilities have similar restrictions, and child care facilities and camps may be open within guidelines specified. (Id. at 11).

Section 7 prohibits mass gatherings for events falling outside of Section 6 categories, defined as "an event or convening that brings together more than ten (10) people indoors or more than twenty-five (25) people outdoors at the same time in a single confined indoor or outdoor space. . . ." (Id. at 12).

Section 8 orders "Entertainment and Fitness Facilities" to remain closed as follows:

1. In addition to the restrictions on Mass Gatherings identified in Section 7 of this Executive Order, the following entertainment and fitness facilities that operate within a confined indoor or outdoor space and do not offer a retail or dining component are ordered to close. Any retail or dining component within the following entertainment and fitness facilities may operate solely for retail or dining, but those components must comply with the restrictions set out in Section 6 of this Executive Order.

9

2. Entertainment and fitness facilities restricted by this Subsection include, but are not limited to, the following types of business:

- Bingo Parlors, including bingo sites operated by charitable organizations
- Bowling Alleys
- Indoor Exercise Facilities (e.g., yoga studios, dance studios, martial arts facilities, indoor trampoline and rock climbing facilities)
- Gyms
- Indoor Fitness Facilities, including but not limited to indoor basketball courts, volleyball courts, racquetball courts, squash courts, and tennis courts
- Health Clubs and Fitness Centers
- Movie Theaters
- Skating Rinks
- Gaming and business establishments which allow gaming activities (e.g., video poker, gaming, sweepstakes, video games, arcade games, pinball machines or other computer, electronic or mechanical devices played for amusement)
- Venues for Receptions or Parties
- Museums
- Amusement Parks
- Bars
- Night Clubs, Dance Halls, or Music Halls where patrons are not seated.

(Id. at 13-14).

Executive Order 141 also includes a categorical exemption: "Worship, religious, and spiritual gatherings, funeral ceremonies, wedding ceremonies, and other activities constituting the exercise of First Amendment rights are exempt from all the requirements of this Executive Order and of Executive Order Nos. 121 and 138, notwithstanding any other provision of this Executive Order or of Executive Order Nos. 121 and 138." (Id. at 7-8).

Executive Order 141 "shall remain in effect through 5:00 pm on June 26, 2020 unless repealed, replaced, or rescinded by another applicable Executive Order." (Id. at 16).

10. Guidance for Restaurants

On May 22, 2020, defendant provided guidance to "help restaurants reduce the spread of COVID-19 in their communities" including recommendations for employees and customers to wear a cloth or disposable face covering. (Compl., Ex. I (DE 1-10) at 2-3). That same date,

10

defendant provided further guidance on businesses selling alcoholic beverages, in reference to

Section 6 and Section 8 of Executive Order 141:

> Section 8(A) of Executive Order No. 141 orders that entertainment and fitness facilities, including but not limited to Bars, must remain closed. "Bars" is defined in Section 1 of the Executive Order as follows:

>> [E]stablishments that are not eating establishments or restaurants as defined in N.C. Gen. Stat. §§ 18B-1000(2) and 18B-1000(6) ... and that are principally engaged in the business of selling alcoholic beverages for onsite consumption.

> Some restaurants call themselves "breweries" or "bars;" some breweries call themselves "restaurants" or "bars;" and some bars call themselves "restaurants" or "breweries." As a result, we have received questions about how to interpret whether an establishment is within the Executive Order's definition of "bar" and must remain closed.

> An establishment shall not be considered to be "principally engaged in the business of selling alcoholic beverages for onsite consumption" — and it may be open under Executive Order No. 141 — if it meets the following test:

>> • It produces alcoholic beverages for commercial sale off-premises and is, therefore, permitted by the ABC Commission under N.C. Gen. Stat. §§ 18B-1101 to 18B-1105.

>> The import of this Guidance is that eating establishments and restaurants as defined in N.C. Gen. Stat. §§ 18B-1000(2) & (6) and breweries, wineries, and distilleries permitted under N.C. Gen. Stat. § 18B-1100 et. seq. are allowed to open under Section 8(A) of Executive Order 141.

> NOTE: If any customers consume food and/or beverages on-premises at the commercial winery, brewery, or distillery, the Emergency Maximum Occupancy requirements, Core Screening, Signage, and Sanitation requirements, and other regulations for restaurants under Section 6(C)(2) of Executive Order No. 141 apply. Therefore, any customers consuming food or beverages on-premises must be in seated groups that are spaced at least six feet apart, and customers or guests will be limited to 50% fire capacity.

(Compl., Ex. J (DE 1-11) at 2).

11.    Guidance for "Mixed-Use" Facilities

11

On June 1, 2020, defendant provided guidance in response to questions "about the rules that apply at a mixed-use facility – for example, a facility that provides both restaurant and entertainment in the same space." (Def. Resp., Ex. 3 (DE 25-3) at 1). Specifically, defendant clarified:

> The Executive Order allows the operation of restaurants if the Executive Order's emergency safety measures are followed. § 6(C). The Executive Order also provides, as an exception to the general rule that entertainment and fitness facilities are closed, the following:
>
> > "Any retail or dining component within the … entertainment and fitness facilities may operate solely for retail or dining, but those components must comply with the restrictions set out in Section 6 of this Executive Order."
>
> § 8(A)(1). The exception above is consistent with previous executive orders. See E.O. No. 120 § 1(B), E.O. No. 121 § 2(C)(19), and E.O. No. 138 § 5(B).
>
> Nothing in Executive Order No. 141 prohibits establishments from providing entertainment for patrons within a mixed-use facility. For example, at a restaurant or within the dining component of a restaurant or fitness facility, televisions may show sporting events. However, an entire entertainment or fitness facility does not amount to a "restaurant," as that term is used in the Executive Order, simply because food is served in a portion of the establishment. For example, a museum cafe does not make the entire museum a restaurant. Put differently, just because an entertainment or fitness facility has a restaurant on premises, that does not give the entire establishment license to operate. Because Section 8(A)(1) states that entertainment and fitness facilities "may operate solely for retail or dining," the portions of the facilities that are not used for those purposes must remain closed.

(Id.).

B.   Dr. Cohen

On March 10, 2020, defendant designated Dr. Cohen as the leader of North Carolina's COVID-19 emergency response effort. (Dr. Cohen Affidavit (DE 25-1) ¶ 7). In this role, Dr. Cohen leads a large team of individuals, including members of the Division of Public Health, the North Carolina State Laboratory, the Division of Health Services Regulation, and the Office of

Emergency Medical Support, as they monitor and analyze the spread of COVID-19 throughout North Carolina and on the national level. (Id. ¶¶ 8-9). According to Dr. Cohen, current research indicates that COVID-19 spreads between people, who are less than six feet apart, through respiratory droplets that are disseminated when an infected person breathes, coughs, sneezes, spits, talks, or sings. (Id. ¶ 12). COVID-19 also spreads through contact with surfaces contaminated by respiratory droplets. (Id. ¶ 13). In addition, although certain people infected with COVID-19 do not experience symptoms, they are capable of spreading the virus to others. (Id. ¶ 14).

According to the Centers for Disease Control, as of May 31, 2020, approximately 1,737,950 people in the United States had contracted COVID-19, resulting in 103,700 deaths. (Id. ¶ 18). Because COVID-19 spreads swiftly through communities, and because a significant portion of COIVD-19 patients require hospitalization, intensive care, and ventilation treatment, COVID-19 outbreaks can overwhelm healthcare systems. (Id. ¶ 16). Currently, there is no cure for COVID-19 or vaccination to prevent its spread. (Id. ¶ 17).

Since outdoor environments are more conducive to social distancing, and since air circulates more freely outside, indoor activities carry a greater transmission risk. (Id. ¶ 21). In addition, stationary activities are more likely to promote the spread of COVID-19 than activities involving movement. (Id. ¶ 22). As a result, indoor entertainment venues such as bars, nightclubs, and exotic dance clubs, where people congregate indoors and participate in stationary activities, present a greater transmission risk. (Id. ¶ 29). The prevalent consumption of alcohol at such establishments also contributes to the elevated risk. (Id. ¶ 31). Finally, behaviors such as singing, yelling, and dancing, that commonly occur in these establishments, increase the transmission risk. (Id. ¶ 32).

13

Dr. Cohen and other North Carolina leaders took the above factors into account when deciding which businesses would be allowed to reopen during Phase Two of defendant's COVID-19 response. (Id. ¶ 28). Proceeding with caution, these leaders employed a "dimmer switch" approach, easing the restrictions on a few, but not all, high risk activities. (Id.).

C.    Plaintiffs' Businesses

In their verified complaint, plaintiffs allege minimal facts concerning the nature of their business operations. Plaintiffs state that their "primary business use is to provide entertainment to their patrons or members in the form of dance performances (both 'adult oriented' and [']non-adult oriented'), and the presentation of live and recorded music presented by singers, bands, and/or disc jockey's ('DJ's'), in conjunction with providing alcohol for responsible consumption, as well as providing food and other accessory uses." (Compl. ¶ 2). They assert that they operate with locations in Guilford, Mecklenburg, Onslow, Duplin, Wake, Gaston, and Pitt counties in this state.

In affidavits filed with their reply in support of the instant motion, plaintiffs elaborate more on their business models and current operations. For example, several plaintiffs sell food, including steaks, seafood, and pasta, at their establishments. (Adkins Affidavit (DE 26) ¶ 10; Bien Affidavit (DE 27) ¶ 10; Baucom Affidavit (DE 28) ¶ 10). They also serve alcoholic and non-alcoholic beverages. (Baucom Affidavit (DE 28) ¶ 10). Moreover, the amount of time that patrons spend inside of plaintiffs' businesses vary. (Adkins Affidavit (DE 26) ¶ 13). While some patrons spend less than 30 minutes at plaintiffs' businesses, others stay from 30 minutes to two hours, and some stay longer than two hours. (Id.). Prior to the onset of COVID-19, many patrons did not interact with the other customers while inside of plaintiffs' businesses. (Adkins Affidavit (DE 26) ¶ 13; Bien Affidavit (DE 27) ¶ 13; Baucom Affidavit (DE 28) ¶ 13). At certain clubs owned and operated by plaintiffs, no one dances except the entertainers, who are now required to wear masks.

(Adkins Affidavit (DE 26) ¶ 14; Bien Affidavit (DE 27) ¶ 11).  In addition, although plaintiffs aver in their complaint that they feature "live and recorded music presented by singers, bands, and/or disc jockey's" in their establishments, (Compl. ¶ 2), several plaintiffs subsequently attested that no one sings in their clubs.  (See e.g., Adkins Affidavit (DE 26) ¶ 14; Bien Affidavit (DE 27) ¶ 11).

Plaintiffs aver that "[i]n the wake of the challenged Executive Orders, Plaintiffs have been forced to shut down and discontinue the operation of their businesses, resulting not only in financial losses, but the complete and permanent loss of the subject businesses, as well as a loss of the goodwill and other non-monetary benefits derived from operating their subject businesses." (Compl. ¶ 82).  Plaintiffs also assert that they "are and will continued to be threatened with criminal and civil penalties, as well as suffer a denial of due process and their civil rights on the basis of the enforcement of the challenged Executive Orders, the perceived violation of which could result in their arrest, forced closure of their businesses, and/or loss of State entitlements if they exercise their protected liberties similar to restaurants, commercial wineries, breweries, and distilleries, or the many other 'service' and other businesses allowed to open and operate under the Phase 2 provisions of Executive Order No. 141." (Id. ¶ 85).

However, according to affidavits subsequently filed, several of plaintiffs' businesses reopened following the issuance of Executive Order No. 141.  (Adkins Affidavit (DE 26) ¶ 14; Bien Affidavit (DE 27) ¶ 11).  Although law enforcement tried to "shut down" one of plaintiffs' clubs, the owner of the club subsequently convinced law enforcement and city attorneys that the club would follow social distancing guidelines and was allowed to reopen under the terms of Executive Order No. 141.  (Adkins Affidavit (DE 26) ¶ 12).    However, plaintiffs are still concerned that they could face criminal charges for reopening.  (Id.).

Plaintiffs have reviewed the "Best Practice Guidelines" promulgated by the Association of Club Executives ("ACE"), and they implemented these guidelines in their clubs that have reopened. (Adkins Affidavit (DE 26) ¶¶ 5-6; Bien Affidavit (DE 27) ¶¶ 5-6; Baucom Affidavit (DE 28) ¶¶ 5-6). In addition, plaintiffs have published their own COVID-19 protocol, which incorporate defendant's guidance for restaurants and ACE's "Best Practice Guidelines." (Adkins Affidavit, Ex. B (DE 26-2); Bien Affidavit, Ex. B (DE 27-2); Baucom Affidavit, Ex. B (DE 28-2). Finally, plaintiffs employ security personnel at some of their businesses to ensure patrons abide by the establishments' rules, including their COVID-19 protocol. (Adkins Affidavit (DE 26) ¶ 9).

D.      Dr. Piramzadian

In support of the instant motion, plaintiffs proffer affidavit of Dr. Piramzadian, the chief medical officer of StarMed Urgent and Family Practice in Charlotte, North Carolina. (Dr. Piramzadian Affidavit (DE 30) ¶ 2). In Dr. Piramzadian's role as chief medical officer, he created a testing program for COVID-19, through which he has tested over 3,000 patients. (Id. ¶ 5). Based on this experience, Dr. Piramzadian believes that COVID-19 spreads through person to person contact when people are less than six feet apart. (Id. ¶ 6). However, Dr. Piramzadian does not believe that COVID-19 spreads through surface contact, or that COVID-19 spreads at a higher rate through activities involving increased respiratory effort, such as singing and dancing. (Id.). In addition, Dr. Piramzadian concludes that there is no greater risk of spreading COVID-19 at bars and adult clubs than there is at restaurants, as long as the establishments follow the same COVID-19 guidelines. (Id. ¶ 10).

## COURT'S DISCUSSION

A.    Standard of Review

A plaintiff seeking a TRO and preliminary injunction "must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008). "[I]njunctive relief . . . may only be awarded upon a clear showing that the plaintiff is entitled to such relief." Id. at 22. In addition, "[m]andatory preliminary injunctive relief in any circumstance is disfavored, and warranted only in the most extraordinary circumstances." Taylor v. Freeman, 34 F.3d 266, 270 n. 2 (4th Cir.1994); see Wetzel v. Edwards, 635 F.2d 283, 286 (4th Cir. 1980).

B.    Analysis

1.    Likelihood of Success on the Merits

a.    Equal Protection Claim

Plaintiffs claim that Executive Order No. 141 violates their right to equal protection by requiring plaintiffs' businesses to remain closed while allowing certain restaurants, breweries, wineries, and distilleries to reopen.

The Fourteenth Amendment prevents any state from "deny[ing] to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend XIV. "In evaluating an equal protection challenge to a rule, courts must first determine the standard of review to apply. If the rule neither infringes a fundamental right nor disadvantages a suspect class, courts apply rational basis review." Nat'l Ass'n for the Advancement of Multijurisdiction Practice v. Lynch, 826 F.3d 191, 196 (4th Cir. 2016) (citing FCC v. Beach Commc'ns, Inc., 508 U.S. 307, 313 (1993)).

Plaintiffs, as commercial business owners, do not belong to a suspect or quasi-suspect class. C.f. Loving v. Virginia, 388 U.S. 1, 11 (1967) (race is a suspect class); Oyama v. California, 332 U.S.S 633, 646 (1948) (national origin is a suspect class); Graham v. Richardson, 403 U.S. 365, 376 (1971) (alienage is a suspect class); Craig v. Boren, 429 U.S. 190, 197 (1976) (gender is a quasi-suspect class); Clark v. Jeter, 486 U.S. 456, 461 (1988) (illegitimacy is a quasi-suspect class).

Moreover, the regulation of business operations does not "impinge on fundamental rights." Levin v. Commerce Energy, Inc., 560 U.S. 413, 426 & n.5 (2010); see, e.g., N. Dakota State Bd. of Pharmacy v. Snyder's Drug Stores, Inc., 414 U.S. 156, 167 (1973) ("[W]e emphatically refuse to go back to the time when courts used the Due Process Clause 'to strike down state laws, regulatory of business and industrial conditions, because they may be unwise, improvident, or out of harmony with a particular school of thought."); Nat'l Ass'n for the Advancement of Multijurisdiction Practice, 826 F.3d at 196; cf. Troxel v. Granville, 530 U.S. 57, 66 (2000) (recognizing a "fundamental right of parents to make decisions concerning the care, custody, and control of their children"); Massachusetts Bd. of Ret. v. Murgia, 427 U.S. 307, 312 n.3 (1976) (fundamental rights include those of a "uniquely private nature," the "right to vote," the "right of interstate travel," rights "guaranteed by the First Amendment," and the "right to procreate").

Accordingly, rational basis review applies to plaintiffs' equal protection claim. Under this standard, the law "is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." Smith Setzer & Sons, Inc. v. S.C. Procurement Review Panel, 20 F.3d 1311, 1320 (4th Cir. 1994) (citing City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 440 (1985)). Furthermore, "those attacking the rationality of the [law] have the burden to negative every conceivable basis which might support

18

it." Lynch, 826 F.3d at 196 (citing Beach Commc'ns, 508 U.S. at 314–15). "In other words, where there are plausible reasons for the rule, [the court's] inquiry is at an end." Id. (quoting Beach Commc'ns, 508 U.S. at 313–14).

Here, defendant implemented Executive Order No. 141 to prevent the spread of COVID-19 and to protect the health and safety of individuals living in North Carolina. This state interest is legitimate. See S. Bay United Pentecostal Church v Newsom, ___ S.Ct. ___, 2020 WL 2813056, at *1 (2020) (Roberts, C.J., concurring) ("Our Constitution principally entrusts '[t]he safety and the health of the people' to the politically accountable officials of the States 'to guard and protect.'") (quoting Jacobson v. Massachusetts, 197 U.S. 11, 38 (1905)); In re Abbott, 954 F.3d 772, 795 (5th Cir. 2020) ("[The governor's] interest in protecting public health during such a time is at its zenith.").

Indeed, over a century ago, during the midst of the smallpox epidemic, the Supreme Court "recognized the authority of a state to enact quarantine laws and health laws of every description." Jacobson, 197 U.S. at 38. In Jacobson, the Supreme Court rejected the claim that Massachusetts's compulsory vaccination law violated the Fourteenth Amendment, holding that judicial review of laws "purporting to have been enacted to protect the public health, the public morals, or the public safety," is available only where the law "has no real or substantial relation to those objects, or is, beyond all question, a plain, palpable invasion of rights secured by the fundamental law." Id. at 31 (emphasis added). Executive Order No. 141 passes this deferential test, where it imposes temporary restrictions on businesses to prevent the spread of COVID-19, a virus with no known cure that has claimed over 103,700 lives nationwide. (Dr. Cohen Affidavit (DE 25-1) ¶¶ 17-18).

Having found the state's interest to be legitimate, the court turns to the classification at issue. Executive Order No. 141 requires entertainment and fitness facilities to remain closed, but

allows restaurants, breweries, wineries, and distilleries to reopen, along with personal care, grooming, and tattoo businesses. (See Compl., Ex. H (DE 1-9); Compl., Ex. J (DE 1-11)). Defendant drew this classification upon the advice of Dr. Cohen, and her team of medical advisors, who concluded that entertainment and fitness facilities "bring together large groups of people in an indoor setting where they will be largely stationary or sitting for long periods of time." (Dr. Cohen Affidavit (DE 25-1) ¶ 11). As a result, "the risk of spreading COVID-19 is higher" at these facilities. (Id.). Moreover, at such venues, "patrons' compliance with personal protection measures is likely to decrease" because "alcohol consumption [is] expected and part of the entertainment environment." (Id. ¶ 31). Finally, where behavior at such venues often includes yelling over loud music, singing, and dancing, and where COVID-19 is transmitted through respiratory droplets, these venues exacerbate the risk of COVID-19 transmission. (Id. ¶¶ 12, 32). In light of these plausible reasons, the classification drawn by Executive Order No. 141 is rationally related to the state's legitimate interest.

Plaintiffs argue the classification lacks a rational basis because restaurants also bring large groups of people together in an indoor environment for prolonged periods of time; yet, restaurants are allowed to reopen. Likewise, plaintiffs argue that they can implement the same protocol that restaurants employ to limit the spread of COVID-19. Finally, plaintiffs proffer an affidavit from a licensed engineer, who attests that nightclubs have the same ventilation systems as restaurants, due to their building code requirements and the number of air changes per hour. (See Jenkins Affidavit (DE 28) ¶ 6).

While plaintiffs effectively point out similarities between their businesses and those allowed to reopen, "a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect." Giarratano v. Johnson, 521 F.3d 298, 303 (4th Cir.

2008).  Indeed, "[i]f the classification has some 'reasonable basis,' it does not offend the Constitution simply because the classification 'is not made with mathematical nicety or because in practice it results in some inequality.'"  Id. (quoting Dandridge v. Williams, 397 U.S. 471, 485 (1970).  As Dr. Cohen attested, defendant employed a "dimmer switch" approach to the reopening of businesses, gradually easing restrictions on high-risk activities, instead of allowing all businesses to reopen at once, in order to monitor the spread of COVID-19.  (Dr. Cohen Affidavit (DE 25-1) ¶ 28).  This measured approach is reasonable and rational, where uncertainties about COVID-19 still loom.  See Williamson v. Lee Optical of Oklahoma Inc., 348 U.S. 483, 489 (1955) ("[R]eform may take one step at a time . . . The legislature may select one phase of one field and apply a remedy there, neglecting the others.  The prohibition of the Equal Protection Clause goes no further than the invidious discrimination.").

Moreover, plaintiffs do not factor into account that there are other reasons, as stated in Executive Order No. 141, for allowing restaurants to open with restrictions, based upon their importance to the community as a whole, while not with the same urgency allowing adult entertainment establishments, or components of businesses that provide adult entertainment, to open.  For instance, Executive Order No. 141 asserts that "food service and food availability remain an important component of North Carolina's response to the COVID-19 pandemic, such that food service providers, including restaurants and other dine-in facilities are encouraged to open to the extent practicable to safely provide food and nutrition to people in North Carolina." (DE 1-9 at 4).  "[T]he closure of on-premises dining in restaurants has significantly curtailed demand for food sold by restaurants and, therefore, disproportionately harmed workers, farms, and businesses involved in the sale of food through the restaurant supply chain and led to the waste of food."  (Id.).  Accordingly, "reopening restaurants for on-premises dining in a safe, strategic

21

manner should ameliorate the adverse economic effects on workers, farms, and businesses involved in the sale of food through the restaurant supply chain, prevent the waste of food, and reduce stress on the supply chain for grocery stores, thereby lowering grocery prices for consumers." (Id.).

At bottom, plaintiffs fail to account for defendant's need to consider a myriad of factors, sometimes in tension with each other, in balancing multiple public needs across the spectrum of the state economy and social fabric. "The precise question of when restrictions on particular social activities should be lifted during the pandemic is a dynamic and fact-intensive matter subject to reasonable disagreement," not suitable for judicial second guessing. See S. Bay United Pentecostal Church, 2020 WL 2813056, at *1 (Roberts, C.J., concurring). "That is especially true where, as here, a party seeks emergency relief in an interlocutory posture, while local officials are actively shaping their response to changing facts on the ground." Id. at *2.

To further dispute the classification's rationality, plaintiffs proffer affidavit of Dr. Piramzadian to rebut Dr. Cohen's conclusions. Dr. Piramzadian does not believe that COVID-19 spreads through surface contact, or that it spreads at a higher rate through activities such as singing, dancing, and exercising. (Dr. Piramzadian Affidavit (DE 30) ¶ 6). However, the court declines plaintiffs' invitation to weigh medical and scientific evidence in usurpation of the executive's role. See S. Bay United Pentecostal Church, 2020 WL 2813056, at *1 (Roberts, C.J., concurring) ("When [state] officials undertake to act in areas fraught with medical and scientific uncertainties, their latitude must be especially broad. Where those broad limits are not exceeded, they should not be subject to second-guessing by an unelected federal judiciary, which lacks the background, competence, and expertise to assess public health and is not accountable to the people.") (internal quotations and citations omitted). While plaintiffs assert numerous grounds for questioning the

timing and manner of defendant's tiered and phased openings, including on the basis of information arising after the issuance of Executive Order No. 141, such grounds are better presented in the first instance to defendant for consideration where defendant is empowered to make decisions based upon rapidly changing circumstances on a daily basis to protect the public health and welfare.  (See DE 1-9 at 4-5) (citing N.C. Gen. Stat. §§ 166A-19.10 – 19.30).

Finally, plaintiffs challenge the classification's rationality by seeking to distinguish cases relied upon by defendant in his response brief.  According to plaintiffs, those cases support plaintiffs' position because the courts determined that "Plaintiffs in those cases deserved equal treatment, not special treatment."  (Pl. Reply (DE 31) at 9).  However, plaintiffs mischaracterize the holdings of these cases, where the courts instead upheld restrictions imposed as result of executive orders limiting activity due to COVID-19 or similar emergencies, with great deference to the assessment of governors' executive orders.  E.g., S. Bay United Pentecostal Church, 2020 WL 2813056, at *1-2 (Roberts, C.J., concurring);  In re Rutledge, 956 F.3d 1018, 1027 (8th Cir. 2020); Antietam Battlefield KOA v. Hogan, No. CV CCB-20-1130, 2020 WL 2556496, at *5 (D. Md. May 20, 2020).  Plaintiffs have pointed to no case in which courts have second-guessed a governor's temporary phased plan of opening of categories of commercial businesses in any state.

Moreover, courts in the wake of the current pandemic have upheld executive orders mandating differential treatment within a single industry, or between different types of business establishments open to the public.  See e.g., In re Abbott, 954 F.3d 772, 778 (5th Cir. 2020) (upholding executive order that required health care professionals to postpone non-essential surgeries and procedures in order to preserve critical medial resources for treatment of COVID-19 patients); Altman v. Cty. of Santa Clara, No. 20-CV-02180-JST, 2020 WL 2850291, at *2 (N.D. Cal. June 2, 2020)  (upholding orders that "exempted 21 categories of 'essential businesses,' such

as grocery stores, health care operations, and banks," while "Firearm and ammunition retailers and shooting ranges were not exempted"); Best Supplement Guide, LLC v. Newsom, No. 220-CV-00965-JAMCKD, 2020 WL 2615022, at *6 (E.D. Cal. May 22, 2020) (upholding executive order that required gyms to remain closed but allowed other businesses to reopen); Bayley's Campground Inc. v. Mills, No. 2:20-CV-00176-LEW, 2020 WL 2791797, at *3 (D. Me. May 29, 2020) (upholding executive order despite plaintiffs' claim that it "discriminates-arbitrarily []- in favor of business in rural counties").

In sum, where the classification drawn by Executive Order No. 141 withstands rational basis review, plaintiffs are unlikely to succeed on the merits of their equal protection claim.

> b.     Plaintiffs' Remaining Claims

Although plaintiffs devote the majority of their briefing to their equal protection claim, they also assert claims under the Due Process Clause of the Fourteenth Amendment, the Takings Clause of the Fifth Amendment, the Free Speech Clause of the First Amendment, and claims under the North Carolina Constitution.

Plaintiffs' claims under the North Carolina Constitution fail, where the Eleventh Amendment prohibits federal courts from granting injunctive relief against "state officials on the basis of state law." Pennhurst State Sch. & Hosp. v. Halderman, 465, U.S. 89, 117 (1984). Likewise, plaintiffs are unlikely to prevail on their claim under the Takings Clause. See Knick v. Twp. of Scott, Pennsylvania, 139 S. Ct. 2162, 2176 (2019) ("As long as an adequate provision for obtaining just compensation exists, there is no basis to enjoin the government's action effecting a taking.").

Plaintiffs are also unlikely to succeed on their substantive and procedural due process claims, where plaintiffs fail to identify a constitutionally cognizable life, liberty, or property

interest.  See Sansotta v. Town of Nags Head, 724 F.3d 533, 540 (4th Cir. 2013) ("To succeed on

a procedural due process claim, a plaintiff must . . . demonstrate that he had a constitutionally

cognizable life, liberty, or property interest . . ."); Siena Corp. v. Mayor & City Council of

Rockville Maryland, 873 F.3d 456, 461 (4th Cir. 2017) ("To succeed on [the substantive due

process claim], Siena must establish (1) that it possessed a cognizable property interest, rooted in

state law[.]").  Although plaintiffs claim to have a fundamental property interest "in conducting

lawful business activities[,]"  (Compl. ¶ 125), the assertion of a "general right to do business" has

not been recognized as a constitutionally protected right.  See Coll. Sav. Bank v. Florida Prepaid

Postsecondary Educ. Expense Bd., 527 U.S. 666, 675 (1999) ("The assets of a business (including

its good will) unquestionably are property, and any state taking of those assets is unquestionably

a "deprivation" under the Fourteenth Amendment. But business in the sense of the activity of doing

business, or the activity of making a profit is not property in the ordinary sense."); see also In re

Premier Auto. Serv., Inc., 492 F.3d 274, 283 (4th Cir. 2007) ("The recognition of such a broad

'right to do business' would be akin to that recognized in Lochner v. New York, 198 U.S. 45

(1905), and its progeny, which the Supreme Court has long since refused to recognize.").

Finally, plaintiffs are unlikely to prevail on their First Amendment claim.  Plaintiffs argue

Executive Order No. 141 impinges on their First Amendment rights because they cannot present

"adult oriented and non-adult oriented" dance performances while their businesses are temporarily

closed.  (Compl ¶ 110).  As an initial matter, such dance is entitled to some, albeit limited,

protection under the First Amendment.  See City of Erie v. Pap's A.M., 529 U.S. 277, 289 (2000)

("[N]ude dancing . . .  is expressive conduct, although . . .  it falls only within the outer ambit of

the First Amendment's protection." ).

Turning to the law at issue, Executive Order No. 141 seeks to prevent the spread of COVID-19, a purpose unrelated to speech; therefore, it is content neutral. See Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989) ("A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others."). Accordingly, the court applies intermediate scrutiny. See Am. Entertainers, L.L.C. v. City of Rocky Mount, N. Carolina, 888 F.3d 707, 715 (4th Cir. 2018).

"Under intermediate scrutiny, [the court] will uphold a regulation that has the potential to burden speech if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest. Id. To conduct this inquiry, "[f]irst, [the court] must determine whether the regulation materially advances an important or substantial interest by redressing past harms or preventing future ones." Id. at 716. "[I]f the regulation materially advances some important or substantial interest, [the court] then ask[s] whether the regulation is narrowly tailored to serve that interest." Id.

As discussed previously, defendant's interest in preventing the spread of COVID-19 and protecting the health and safety of the public is a substantial government interest. Moreover, by requiring the temporary closure of businesses that present a higher risk of spreading COVID-19, (see e.g., Dr. Cohen Affidavit (DE 25-1) ¶ 29), Executive No. 141 materially advances this interest.

Next, the court considers whether Executive Order No. 141 is narrowly tailored. "The narrow-tailoring requirement is met so long as the regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." Id. at 717. Importantly, as "long as the means chosen are not substantially broader than necessary to achieve the government's interest, the regulation will not be invalid simply because a court concludes that the government's

interest could be adequately served by some less-speech-restrictive alternative." Id. (citing Ward, 491 U.S. at 799). Here, the court finds that Executive Order No. 141 is narrowly tailored. The substantial government interest in preventing the spread of COVID-19 would be achieved less effectively if the entertainment and fitness facilities were allowed to reopen, since such facilities present a higher risk of COVID-19 transmission. (See e.g., Dr. Cohen Affidavit (DE 25-1) ¶ 29). Thus, Executive Order No. 141 is sufficiently narrowly tailored to survive intermediate scrutiny.

In sum, plaintiffs fail to establish they are likely to succeed on the merits of any of their claims.

2. Irreparable Harm

Plaintiffs also fail to establish that they are likely to suffer irreparable harm in the absence of preliminary relief. To satisfy this factor, plaintiffs "must make a clear showing of irreparable harm . . . and the required irreparable harm must be neither remote nor speculative, but actual and imminent." Scotts Co. v. United Indus. Corp., 315 F.3d 264, 283 (4th Cir. 2002).

First, plaintiffs argue the deprivation of their constitutional rights constitutes irreparable harm. However, merely asserting a constitutional claim is insufficient to trigger a finding of irreparable harm. Indeed, the Fourth Circuit has held that within the context of constitutional violations, "a plaintiff's claimed irreparable harm is 'inseparably linked' to the likelihood of success on the merits . . ." WV Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave, 553 F.3d 292, 298 (4th Cir. 2009). As indicated above, plaintiffs are unlikely to succeed on the merits of their constitutional claims; therefore, their alleged constitutional injuries do not constitute irreparable harm.

Next, plaintiffs contend they will suffer irreparable harm in the form of lost income. However, the Fourth Circuit has refused to find economic harm irreparable. See Hughes Network

27

Sys., Inc. v InterDigital Commc'ns Corp., 17 F.3d 691, 694 (4th Cir. 1994). Moreover, several plaintiffs have reopened their businesses, (see e.g., Adkins Affidavit (DE 26) ¶ 12; Bien Affidavit (DE 27) ¶ 12), diminishing the likelihood of financial loss. Likewise, plaintiffs may continue to gain revenue from the restaurant component of their businesses. (See Adkins Affidavit (DE 26) ¶ 10). Accordingly, this argument fails.

In a similar vein, plaintiffs assert in their complaint that they will suffer "the complete and permanent loss of the subject businesses, as well as a loss of the goodwill and other non-monetary benefits derived from operating their subject businesses." (Compl. ¶ 82). Such injuries, if actual and imminent, can constitute irreparable harm. See Hughes Network Sys., 17 F.3d at 694; Fed. Leasing, Inc. v. Underwriters at Lloyd's, 650 F.2d 495, 500 (4th Cir. 1981). However, plaintiffs put forth no evidence to substantiate this bare assertion, or explain why such loss is imminent. Moreover, the reopening of plaintiffs' businesses undercuts this argument.

Finally, plaintiffs argue the threat of civil and criminal penalties constitutes irreparable harm. However, this harm is speculative and remote, rather than actual and imminent, where several of plaintiffs' business have reopened without imposition of any civil or criminal penalties. (See e.g., Adkins Affidavit (DE 26) ¶ 12; Bien Affidavit (DE 27) ¶ 12).

In sum, plaintiffs fail to establish irreparable harm in absence of preliminary relief.

3.      Balance of the Equities and the Public Interest

The final factors, the balance of the equities and the public interest, "merge" when the government is the party opposing the preliminary injunction. Roe v. Dep't of Def., 947 F.3d 207, 230 (4th Cir. 2020) (citing Nken v. Holder, 556 U.S. 418, 435 (2009)). Here, these factors weigh against entry of the preliminary injunction sought. Indeed, where defendant has taken intricate steps to craft reopening policies to balance the public health and economic issues associated with

the COVID-19 pandemic, while recognizing the continued severe risks associated with reopening, and where neither the court nor plaintiffs are better positioned to second-guess those determinations, the public interest does not weigh in favor of injunctive relief.

In sum, where plaintiffs are not likely to succeed on the merits of their claims, where plaintiffs have not made a clear showing of irreparable harm, and where the balance of the equities and public interest weigh against entry of preliminary injunction, plaintiffs' motion for a preliminary injunction is denied.

## CONCLUSION

Based on the foregoing, plaintiffs' motion for preliminary injunction (DE 13) is DENIED. The court's initial scheduling order will follow.

SO ORDERED, this the 8th day of June, 2020.

LOUISE W. FLANAGAN
United States District Judge